UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| STEPHANIE ROBERTS, | ) |
| Plaintiff, | ) Case No. 2:11-cv-01917-JCM-GWF |
| vs. | ) **ORDER** |
| SMITH'S FOOD & DRUG CENTERS, INC., | ) **Motion for Sanctions - #66** |
| Defendant. | ) |

This matter is before the Court on Plaintiff's Motion for Sanctions (#66), filed on April 3, 2014. Defendant filed its Response to the Motion for Sanctions (#68) on April 21, 2014. Plaintiff filed her Reply (#71) on May 1, 2014. The Court conducted a hearing in this matter on May 8, 2014. Defendant filed a post-hearing Production of Documents (#73) on May 15, 2014.

Plaintiff's motion seeks the imposition of severe sanctions against Defendant on two grounds. First, Plaintiff alleges that Defendant improperly failed to preserve video evidence of the subject accident. Second, Plaintiff alleges that Defendant's counsel engaged in improper ex parte written communications with Plaintiff's treating physician, Dr. Moris Senegor.

**BACKGROUND**

**1.   Facts Relating to Accident and Possible Video Recording.**

Plaintiff Stephanie Roberts was injured in an accident at Defendant's supermarket on October 21, 2009. Smith's employee Claudia Bonner prepared a Customer Incident Report on the date of the accident. According to the report:

> Ms. Roberts was knocked down by an employee who came around the corner Ran into her - She fell, the olive oil bottle broke, cut her right hand.  When I came to where Ms. Roberts had fallen she was

1  on the floor sitting with a paper towel on her hand. She was
2  bleeding, she explained that a young man one of our employees had knocked her down because he was running. She cut her right palm
3  below the thumb with glass from the olive oil bottle she wanted to purchase. She also said she fell on her right hip and it was hurting.

4  *Motion for Sanctions (#66), Exhibit 3*.

5  The Customer Incident Report form contains a section entitled "Supplemental Questions"
6  which includes the question: "Is there Video Evidence?" Ms. Bonner circled "Y" indicating that
7  there was video evidence. In March, 2010, Plaintiff's counsel sent a letter to Defendant directing it
8  to preserve any video recordings of the accident. *Defendant's Response (#68), Exhibit H.*

9  After this lawsuit was filed, Plaintiff served requests for production and interrogatories on
10 Defendant. Request No. 5 requested photographs, video recordings, audio recordings and other
11 documentary evidence. *Motion for Sanctions (#66), Exhibit 5*. Defendant responded to this request
12 in August 2012 by referring to its response to Request No. 3, which requested any written or
13 recorded statements. *Id.* Defendant did not otherwise indicate in its response whether any video
14 recording of the accident existed or did not exist. Interrogatory No. 20 asked Defendant to identify
15 any pictures, photographs, video or visual depictions of the subject incident. Defendant responded
16 to this interrogatory by stating: "None." *Motion for Sanctions (#66), Exhibit 6.*

17 Santiago Ibarra, Jr., the Smith's employee who collided with Plaintiff, was deposed on
18 September 6, 2012. He testified as follows:

19     A.    I was running full speed down aisle 10. It was the dog and cat food aisle. Toward the end of the aisle I couldn't see any
20            oncoming people, so I came to a halt.
           My momentum caused me to still bump into
21            her coming out of the corner, and I even reached to try to
22            catch her from falling, but it was too late. And she fell and I
           felt horrible. The jar had broken. I felt even more horrible
           than I had from just bumping into her, because I seen that she
23            was bleeding.

24           . . .

25     Q.    And when you say you were running full speed --

26     A.    I was pretty much sprinting. I wasn't jogging. I wasn't fast walking. I was running.

27     Q.    Sprinting?
28

A. Yes.

Q. And what part of your body hit her?

A. My shoulder. My lower left shoulder bumped her right side.

*Defendant's Response (#68), Exhibit C.*

Ms. Roberts testified at her deposition that she "got slammed, fell to the floor, had a cut hand, had a back that was paining me." *Motion for Sanctions (#66), Exhibit 4*, *Plaintiff's Deposition, pg. 40*. Ms. Roberts testified that she didn't see the employee coming toward her and was stunned by the collision and by being knocked to the floor. *Id., pg. 42:9 to 43:15*.

In response to Plaintiff's motion for sanctions, Defendant has submitted the affidavit of Claudia Bonner, who prepared the Customer Incident Report. Ms. Bonner states:

> 6. In the Supplemental Questions section of the Customer Incident Report I circled that video evidence was available. I did not do so because I knew there was video surveillance of the accident itself; rather I did so based on my speculation that there must have been video somewhere in the store.
>
> 7. I did not review any video surveillance from the store for October 21, 2009. As a Customer Service Manager I did not have access to the video recording system at SMITH'S Store No. 371. To my knowledge only the Store Director and Assistant Store Director had access to the video recording system at SMITH'S Store No. 371.
>
> 8. I am not aware of what the surveillance cameras showed or not on October 21, 2009.

*Defendant's Response (#68), Exhibit E.*

Defendant also submitted the affidavit of Linda Snyder, the Loss Prevention Manager for Smith's Food & Drug Centers, Inc., District #4, Smith's Store No. 371. Ms. Snyder states that she has personal knowledge of the video surveillance recording system at the subject store. She states that "[o]n October 21, 2009, there were no surveillance cameras trained on the aisle or area where plaintiff was bumped." *Defendant's Response (#68), Exhibit I*, ¶ 4. Ms. Snyder further stated that video recordings were generally only preserved for a period of 30 days, after which they were automatically recorded over. *Id.*, ¶ 5.

. . .

. . .

### 2. **Defendant Counsel's Letters to Dr. Senegor.**

On May 9, 2013, Dr. Moris Senegor's office sent an "Urgent Review Request, Spinal Surgery Authorization Request" to Defendant Smith's claims administrator requesting authorization to perform laminectomy and spinal fusion surgery on the Plaintiff. *Defendant's Response (#68), Exhibit A.* At the request of Smith's, Defendant's counsel Jerry Busby sent a letter to Dr. Senegor on May 10, 2013 in response to the "Urgent Review Request, Spinal Surgery Authorization Request." *Defendant's Response (#68), Exhibit C.* Mr. Busby requested that Dr. Senegor stop communicating with Smith's and its third-party administrator, Sedgwick CMS. Mr. Busby's letter then proceeded to state:

> As you are probably aware, there is current litigation pending between Stephanie Roberts and Smith's. Therein, Ms. Roberts is claiming that her "current" low back problems are causally related to the accident at Smith's. Smith's vehemently disagrees. Further, your letter dated April 8, 2013[1] incorrectly indicates that "although [Ms. Roberts] had some residual back symptoms. The **new problem** began in 2009 when she fell at a grocery store." (Emphasis added.) In fact, Smith's has retained a medical expert that has concluded that the (sic) "The accident caused some minor discomfort that resolved quickly. It did not aggravate her underlying condition."
>
> Based upon Ms. Robert's own medical records and the opinions from the medical expert, Smith's will not agree to pay any portion of the proposed future surgery. Further, given the fact that Plaintiff's own primary care doctors previously refused to clear her for surgery, we do not feel that any minimal benefit from this extreme surgery is worth the risk of performing the same. As such, Smith's strongly urges that the surgery not take place and will not be responsible for the expense or any unfortunately (sic) consequences of the same.

*Defendant's Response (#68), Exhibit B.*

Smith's or Sedgwick CMS apparently received additional requests from Dr. Senegor's office and the hospital where the surgery was performed for payment of Ms. Roberts medical bills. On September 10, 2013, Mr. Busby sent a letter to Dr. Senegor and the Billing Administrator of St. Joseph's Medical Center which was referenced: "Re: Medical Bills of Stephanie Roberts **will not be paid by SMITH'S or SEDGWICK**". Mr. Busby's letter further stated:

---

[1] The April 8, 2013 letter referred to by Mr. Busby was a letter that Dr. Senegor sent to another of Ms. Robert's physicians regarding his evaluation of her low back condition. It was not a letter that Dr. Senegor addressed to Smith's or its claims administrator.

4

> The pending litigation arises out of an accident in which Ms. Roberts was bumped at a SMITH'S grocery store and fell cutting her hand on a broken bottle. First aid treatment was rendered to Ms. Roberts and she left the store under her own power.
>
> Prior to the accident at SMITH'S, Ms. Roberts had a fusion of her L4-5 vertebrae in 2004. After the surgery, she continued to complain of and treat for problems with her low back. After the accident at SMITH'S, Ms. Roberts symptomatology did not significantly change. Accordingly, the medical expert retained by SMITH'S and SEDGWICK performed an Independent Medical Examination and records review and concluded that the accident at SMITH'S resulted in a **minor** aggravation of Ms. Roberts pre-existing low back condition. Further, said expert has concluded that the surgery performed in Stockton, California was **not causally related** to the accident at SMITH'S, but rather is the result of adjacent segment breakdown experienced after the original fusion surgery in 2004.
>
> Based upon the opinions of the medical expert, SMITH'S has made it amply clear that they will not be responsible for or pay for **any medical treatment after 2009**. As such, you were misinformed when you were told that SMITH'S and/or SEDGWICK should be billed for your recent treatment. Accordingly, by means of this letter, I demand on behalf of SMITH'S and SEDGWICK that you stop from sending bills to them as they are not responsible for and will not pay for any of the medical treatment recently performed by you. Further, I notice that Ms. Roberts is a Medicare beneficiary and I strongly urge you to submit all of your billing statements to Medicare for reimbursement.

*Plaintiff's Motion for Sanctions (#66), Exhibit 2.*

On June 24, 2013, Dr. Senegor performed the following surgical procedures on Ms. Roberts: (1) Removal of L4-5 Click X hardware, (2) Bilateral L5-S1 foraminotomies, and (3) Posterolateral fusion, L3-4, L4-5, L5-S1, with pedicle screw instrumentation and auto allograft. *See Defendant's Production of Documents Pursuant to Court Order (#73), Operative Report.* Dr. Senegor was deposed in this action on December 19, 2013. *Id., Senegor Deposition Transcript.* Dr. Senegor testified that the physical defects or conditions in Ms. Robert's lumber spine that he operated upon in June 2013 were not caused by the October 21, 2009 accident. He testified, however, that the accident trauma caused or may have caused these conditions to become symptomatic or more symptomatic with pain. Dr. Senegor was aware that Ms. Roberts underwent a lumbar surgery in 2004. He relied on her statements to him that following that surgery she was doing well and did not experience low back symptoms until after the October 21, 2009 accident. Dr. Senegor acknowledged that he had not reviewed Ms. Roberts' medical treatment records

1  between the 2004 surgery and the October 21, 2009 accident which may provide different

2  information regarding Plaintiff's low back symptoms during that time period.

## DISCUSSION

**1.  Defendant's Alleged Failure to Preserve the Video Recording of the Accident**.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *LaJocies v. City of North Las Vegas*, 2011 WL 1630331, *1 (D.Nev. 2011), citing *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). A party has a duty to preserve evidence when it knows or has reason to know that the evidence is potentially relevant to litigation. *Id.*, citing *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). The court has the inherent authority to impose sanctions on a party who destroys or fails to preserve evidence prior to the commencement of anticipated litigation. *Demena v. Smith's Food & Drug Centers, Inc.*, 2012 WL 3962381, *1 (D.Nev. 2012), citing *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) and *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).

In *Demena v. Smith's Food & Drug Centers, Inc.*, the court held that defendant was placed on notice of its duty to preserve relevant evidence shortly after a slip and fall accident occurred in its store. In so holding, the court stated:

> While all slip and fall incidents may not result in litigation, the incident report made at the scene by Plaintiff and employees, combined with the fact that Plaintiff was transported out of the store on a gurney, with the assistance of emergency medical personnel, are sufficient to trigger Defendant's duty to preserve relevant evidence. *See Aiello v. Kroger Co.*, 2010 WL 3522259, *3 (D.Nev. Sept. 1, 2010) (noting completing an accident report was sufficient to put Defendant on notice of potential litigation); *see also English v. Walmart*, 2011 WL 3496092 (D.Nev. August 10, 2011) (finding Defendant did not breach its duty to preserve video footage because Plaintiff did not file an accident report at the scene and notice of litigation did not arise until three months later when Plaintiff's attorney requested the video).

2012 WL 3962381, at *2.

Defendant attempts to distinguish *Demena* on the grounds that Ms. Roberts left the store under her own power and was not transported to the hospital by ambulance. The Court rejects this as a valid distinction. As in *Demena*, an incident report was completed on the date of the accident.

6


Ms. Roberts also provided a written statement about the accident. Defendant's initial investigation indicated that the accident was caused by a store employee who ran down an aisle and bumped into Ms. Roberts, knocking her down. Ms. Roberts was visibly injured in the accident. She cut her hand on a broken bottle. She also complained of hip pain. These circumstances were more than sufficient to place Defendant on notice of the likelihood of a bodily injury claim and/or litigation and thereby give rise to its duty to preserve evidence in its possession, custody or control, including any video recording of the accident.

Although Ms. Bonner indicated in the Customer Incident Report that video evidence existed, she states in her recent affidavit that she did not, in fact, know whether a video recording of the accident actually existed. Defendant's Loss Prevention Manager, Ms. Snyder, states that surveillance cameras were not directed at the area where the accident occurred and no video recording of the accident ever existed. Plaintiff's counsel did not pursue discovery on this issue which might have provided additional evidence as to whether the accident was actually within camera range and therefore recorded by the video surveillance system. It is also questionable whether Plaintiff has suffered substantial prejudice by Defendant's alleged failure to preserve a video recording of the accident. It is undisputed that Defendant's employee ran down the store aisle and collided with the Plaintiff. The liability of Defendant for the negligence of its employee in this circumstance appears clear. A video recording of the accident might be useful, however, in determining the degree of force involved in the collision. In the absence of evidence that a video recording of the accident ever existed, however, there is no basis upon which to impose sanctions on Defendant for the alleged failure to preserve video evidence.

**2.      Defense Counsel's Ex Parte Communications with Dr. Senegor.**

Plaintiff contends that Mr. Busby's May 10, 2013 and September 10, 2013 letters to Dr. Senegor violated the doctor-patient privilege and warrant the imposition of sanctions.

Nevada Revised Statute (NRS) Section 49.225 states as follows:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications among himself, his doctor or persons who are participating in the diagnosis or treatment under the direction of the doctor, including members of the patient's family.

NRS § 49.235 states that the privilege may be claimed by the patient, his guardian or conservator, or by the personal representative of a deceased patient. The doctor may claim the privilege on behalf of the patient. NRS § 49.245 sets forth several exceptions to the privilege, including subsection 3 which provides that there is no privilege "[a]s to written medical or hospital records relevant to an issue of the condition of the patient in any proceeding in which the condition is an element of the claim or defense."

Plaintiff relies on District Judge Edward Reed's August 27, 2009 order in Parker v. Upsher-Smith Laboratories, Inc., United States District Court, District of Nevada, Case No. 3:06-cv-00518, Dkt. No. 101, in arguing that Mr. Busby's letters to Dr. Senegor violated Plaintiff's doctor-patient privilege. In Parker, Judge Reed overruled the magistrate judge's order which held that defendant's counsel were not prohibited from engaging in ex parte communications with the plaintiff's treating physicians. The magistrate judge's order was based on the conclusion that there is no federal doctor-patient privilege and that ex parte communication between a defendant's lawyer and the plaintiff's treating physicians was not prohibited. In holding that Nevada's doctor-patient privilege statute was applicable, Judge Reed noted that in a diversity action, the court applies Nevada substantive law and federal procedural law, and that "[u]nder Federal Rule of Evidence 501, when state law supplies the rule of decision, 'the privilege of a witness . . . shall be determined in accordance with State law.'" Parker, at 6.

After noting that NRS § 49.245.3 only excepts from the doctor-patient privilege, written medical or hospital records, Judge Reed stated:

> It would therefore follow that the physician-patient privilege set forth in sections 49.225 and 49.235 otherwise applies to all communications and treatment of such a patient. Read this way, the privilege would not only be applicable in the informal discovery (i.e., ex parte interviews) proposed by Defendant, but in the period of formal discovery and even at trial.

Id., at 7.

Judge Reed then considered the legislative history regarding the amendment that resulted in the exception in NRS §49.245.3. This history indicated that the authors of the amendment were concerned with defense lawyers engaging in ex parte communications with doctors and "putting

8

doctors in a bad position by asking them to unilaterally waive the physician-patient privilege." Id., at 8. Based on this history, Judge Reed construed the Nevada doctor-patient privilege as precluding the ex parte interview of a treating physician by a defendant's lawyer. He held, however, that the privilege "did not prevent depositions or the other usual discovery methods under the Federal Rules of Civil Procedure which may inquire into the relevant medical condition of Plaintiff." Id., at 9.

NRS § 49.225 protects from disclosure confidential communications between a patient and his or her doctor. NRS § 49.215.1 states that "[a] communication is 'confidential' if it is not intended to be disclosed to third persons . . . ." The statute does not, by its terms, preclude all ex parte communications between a defendant's lawyer and a plaintiff's treating physician.[2] Rather, it precludes a physician from disclosing confidential communications relating to the treatment of the patient. Mr. Busby did not engage in an ex parte interview of Dr. Senegor during which the doctor disclosed confidential communications relating to Ms. Roberts' medical condition. Mr. Busby's letters did not expressly seek a responsive communication from Dr. Senegor to the assertions contained in the letters. Mr. Busby's letters might have induced a response from Dr. Senegor, but the doctor did not, in fact, respond. Although the court has the inherent authority to sanction a lawyer for attempting to violate another party's privilege, it does not appear that Mr. Busby made such an attempt. Mr. Busby's letters, standing alone, did not violate Nevada's doctor-patient privilege.

Plaintiff has not identified any other statute or rule that Mr. Busby allegedly violated by sending the letters to Dr. Senegor. Mr. Busby was reasonably justified in responding on behalf of Defendant to Dr. Senegor's request for authorization and payment for the surgery, and in advising him that Defendant did not provide medical insurance for the Plaintiff and that Defendant disputed legal liability for Ms. Roberts' medical treatment. Mr. Busby, however, went beyond what was reasonably necessary to communicate that position. His letters can reasonably be viewed as an

---

[2] Dr. Senegor is not a specially retained expert witness under Fed.R.Civ.Pro. 26(a)(2)(B) who arguably may not be contacted, ex parte, by the opposing party's counsel. *See Erickson v. Newmar Corporation*, 87 F.3d 298, 301 (9th Cir. 1996) and *The IPATT Group, Inc. v. Scotts Miracle-Gro Company*, 2013 WL 3043677, *7 (D.Nev. 2013).

1    attempt to influence Dr. Senegor's medical opinions on the issue of causation.  As a matter of
2    fairness, Mr. Busby should at minimum have copied Plaintiff's counsel with the letters.
3        The Court is particularly concerned about the statements in Mr. Busby's May 10, 2013
4    letter that "given the fact that Plaintiff's own primary care doctors previously refused to clear her
5    for surgery, we do not feel that any minimal benefit from this extreme surgery is worth the risk of
6    performing the same.  As such, Smith's strongly urges that the surgery not take place and will not
7    be responsible for the expense or any unfortunately (sic) consequences of the same."  This type of
8    interference in the doctor-patient relationship could potentially result in a doctor deciding not to
9    provide appropriate treatment, without either the patient or her attorney knowing of the opposing
10   lawyer's involvement in the decision.  The Court believes that such an ex parte communication
11   violates Rule 8.4(d) of the Nevada Rules of Professional Conduct which prohibits a lawyer from
12   engaging in conduct that is prejudicial to the administration of justice.
13       There is no evidence, however, that Mr. Busby's letters affected the medical treatment
14   provided by Dr. Senegor or the medical opinions that he expressed during his deposition testimony.
15   Dr. Senegor performed the surgery that Mr. Busby's May 10, 2013 letter sought to discourage.  Dr.
16   Senegor testified that the physical conditions in Ms. Roberts' lumbar spine were not caused by the
17   accident at Defendant's supermarket.  His opinions in this respect appear to have a reasonable
18   medical foundation.  Dr. Senegor testified that based on the history provided to him by Plaintiff, the
19   accident aggravated the physical defects in her spine and caused them to become symptomatic with
20   pain.  The Court therefore concludes that Plaintiff has not been prejudiced by Mr. Busby's letters to
21   Dr. Senegor.  Accordingly, neither the severe sanction of entering judgment against the Defendant
22   nor imposing evidentiary sanctions against Defendant is warranted in this case.
23       Because Plaintiff failed to set forth a valid basis under the law for imposing sanctions on
24   Mr. Busby for his letters, the Court will not impose sanctions on Defendant or its counsel. The
25   Court, however, notifies Mr. Busby that his ex parte attempt to dissuade Plaintiff's treating
26   physician from providing medical treatment to the Plaintiff violated Rule 8.4(d) of the Nevada
27   Rules of Professional Conduct and cautions him against any such future conduct.
28   . . .

## CONCLUSION

Plaintiff has failed to set forth sufficient factual or legal grounds for the imposition of sanctions against Defendant or its counsel. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Sanctions (#66) is **denied**.

DATED this 21st day of May, 2014.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge